In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-4298

EDWIN C. WEST, *et al.*,

*Plaintiffs-Appellees*,

*v.*

KURT SCHWEBKE, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99-C-0147—**Lynn Adelman**, *Judge*.

ARGUED MAY 23, 2003—DECIDED JUNE 20, 2003

Before EASTERBROOK, RIPPLE, and WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*.  Like most other states, Wisconsin holds some sex offenders past the ends of their prison sentences. Those deemed "sexually violent persons" are subject to civil commitment of indefinite duration under Wis. Stat. ch. 980. See *Adams v. Bartow*, No. 02-3234 (7th Cir. June 3, 2003). Plaintiffs are among those detained, or committed, under Chapter 980. They were held in the Wisconsin Resource Center until June 2001, when all but one were moved to the Sand Ridge Secure Treatment Center. Individual treatment plans used at the Resource Center contemplated the possibility that misconduct would lead to what the state calls "therapeutic

seclusion": placement in a cell that contains only a concrete platform (which serves as a bed), a toilet, and a sink. Detainees in seclusion often were deprived of clothing and other amenities. Secluded detainees were allowed out, in shackles, one hour a day on weekdays and not at all on weekends (when staffing levels were lower). When the staff thought that secluded detainees might be ready for return to the general population, they were allowed out two hours a day, but still kept in restraints. One plaintiff was held in seclusion for 82 consecutive days (and more than 100 days all told in 1998); all plaintiffs have been held in seclusion for at least 20 consecutive days.

In this suit under 42 U.S.C. §1983 the detainees contend that "therapeutic seclusion" as practiced in the Wisconsin Resource Center violated their rights under the due process clause of the fourteenth amendment. See *Youngberg v. Romeo*, 457 U.S. 307 (1982). Sand Ridge has different policies, not challenged in this litigation; the one plaintiff who remains at the Resource Center is being held for violation of probation and not as a civil detainee, so the suit has become one for damages rather than injunctive relief. In response to defendants' motion for summary judgment—a motion that sought the benefit of qualified immunity, if not victory on the merits—the detainees offered the affidavits of two respected psychiatrists, one of whom (Kenneth Tardiff) had been chairman of the American Psychiatric Association's task force on the appropriate uses of seclusion and restraint. These experts concluded unequivocally that the duration over which the Resource Center applied seclusion was medically inappropriate and universally condemned by the psychiatric profession as a therapeutic tool. One of the affiants went further and opined that any contrary view could not represent an honest, professional judgment. Defendants offered contrary affidavits from three experts

of their own, psychiatrists with enough fortitude to risk being labeled dishonest and unprofessional. The district court concluded that this dispute within the profession prevents summary judgment. See *West v. Macht*, 235 F. Supp. 2d 966 (E.D. Wis. 2002). The judge lopped off some additional claims and granted summary judgment to some defendants; we limit this opinion to the remaining claims and parties. Defendants now pursue an interlocutory appeal, arguing that qualified immunity entitles them to an immediate end to what is left of the litigation. See *Behrens v. Pelletier*, 516 U.S. 299 (1996).

Plaintiffs' claims rest on the principle articulated in *Youngberg* that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321-22. Although the Court rejected in *Youngberg* an argument that the state must establish the "necessity" of applying to detainees restraints or other forms of close custody, it concluded that a state still must ensure that considered judgment has been exercised. Detainees are entitled to "the exercise of professional judgment as to the needs of residents" (*id*. at 322); if professional judgment leads to the conclusion that restraints are necessary for the well-being of the detainee (or others), then the Constitution permits those devices. Cf. *Bell v. Wolfish*, 441 U.S. 520, 539-40 (1979) (similar conclusion with respect to pretrial detainees, who like civil detainees are held for reasons other than punishment). *Seling v. Young*, 531 U.S. 250, 265 (2001), generalizes the proposition this way: "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed."

Defendants allow that these rules may be apt for normal detainees, such as the profoundly retarded plaintiff in *Youngberg* who was committed because, with an 18-

month-old mind in a 33-year-old body, he was unable to control his impulses and had become too unruly for his family to handle. By contrast, defendants contend, persons committed under Chapter 980 are "nontraditional" detainees who may be handled more roughly. The word "nontraditional" is a mantra in defendants' briefs. Yet *Seling*, a case about persons detained as sexually dangerous predators, quoted favorably from *Youngberg*. So did *Foucha v. Louisiana*, 504 U.S. 71, 79-80 (1992), which held that persons charged with crime, and acquitted on the ground of insanity, may not be held in civil commitment beyond the time when they no longer pose a danger to self or others. To the extent that plaintiffs are uncontrollably violent, and thus pose a danger to others, Wisconsin is entitled to hold them in segregation for that reason alone; preserving the safety of the staff and other detainees takes precedence over medical goals. So we said in *Thielman v. Leean*, 282 F.3d 478 (7th Cir. 2002); so the district judge held in this very case. Just as a pretrial detainee may be put in isolation—indeed, may be *punished* for violating institutional rules, provided that the jailers furnish notice and an opportunity for a hearing, see *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002)—so a civil detainee may be isolated to protect other detainees from aggression. Institutions may employ both incapacitation and deterrence to reduce violence within their walls—though if mental limitations render a detainee insensible to punishment, the only appropriate goal would be incapacitation. Either way, if at trial defendants can establish that their use of seclusion was justified on security grounds, they will prevail without regard to the question whether extended seclusion is justified as a treatment. There is nothing that invocation of immunity can do for them, however, as long as the evidence is in conflict on the question *whether* a reasonable person could have thought the use of seclusion appropriate from a security perspective.

Qualified immunity is available unless the rules of law on which plaintiffs rely are so clearly established that a reasonable state actor is bound to understand how they apply to the situation at hand. See, e.g., *Saucier v. Katz*, 533 U.S. 194 (2001); *Anderson v. Creighton*, 483 U.S. 635 (1987). Defendants acted after *Foucha* had made it clear that *Youngberg* applies to civil detainees who have committed criminal acts. See also, e.g., *Allen v. Illinois*, 478 U.S. 364 (1986). This leaves only the question whether defendants' use of seclusion could be justified on either security or treatment grounds—and the district judge thought this question unresolvable short of trial, given the clash of expert opinions. An interlocutory immunity appeal may not be used to present factual disputes for pretrial appellate resolution. See *Johnson v. Jones*, 515 U.S. 304 (1995). "A court required to rule upon the qualified immunity issue must consider . . . this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the [public official's] conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201 (emphasis added). Taken in the light most favorable to the plaintiffs, the record in this case shows that defendants kept plaintiffs in seclusion for periods far exceeding what could be justified by considerations of either security or treatment. Now maybe plaintiffs' experts are wrong, but it will take a trial to sort matters out.

To get anywhere on this appeal, defendants would have to establish that no decision by a person with an advanced degree is open to question in litigation. Defendants have masters degrees in psychology. Their legal position boils down to a contention that holders of such degrees never need fear liability, even if the whole medical profession and every published scholarly article are against them. We grant the proposition, which may be found in *Youngberg* itself, that states are entitled to experiment. Detainees need not receive optimal treat-

ment, and the Constitution does not immediately fall into line behind the majority view of a committee appointed by the American Psychiatric Association. In a world of uncertainty about how best to deal with sexually dangerous persons, there is room for both disagreement and trial-and-error; all the Constitution requires is that punishment be avoided and medical judgment be exercised. But this is a far cry from saying that anything goes—that if the holder of a masters degree in psychology were to decide that sex offenders should be lobotomized and subject to daily electroshock "therapy," no court could gainsay that decision. Prisons may attract those members of the profession most disposed to stern measures, which makes some outside supervision vital.

What sets this case apart from others in which the defendants received immunity, such as *Allison v. Snyder*, No. 03-1570 (7th Cir. June 19, 2003), is that respected experts have opined, on plaintiffs' behalf, that the defendants' choices exceed the scope of honest professional disagreement. Plaintiffs must show something worse than a mistake about a matter open to bona fide disagreement or genuine uncertainty. But if a trier of fact concludes that the Resource Center's use of seclusion was designed to inflict extra punishment for the plaintiffs' sex crimes, rather than to treat their condition or protect others from new violence, then the plaintiffs are entitled to damages.

AFFIRMED

A true Copy:

      Teste:

                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*

USCA-02-C-0072—6-20-03