**Daniel R. WILLIAMS, Plaintiff,**

v.

**Helene NELSON, Secretary, Wisconsin Department of Health and Family Services, Steve Watters, Director, Sand Ridge Secure Treatment Center, David Thorton, Treatment Director Srstc, Steve Schneider, Security Director Srstc and Dr. William Aeytey, Psychiatrist Srstc, Defendants.**

No. 04–C–774C.

United States District Court, W.D. Wisconsin.

Nov. 7, 2005.

Daniel Williams, pro se.

Jody J. Schmelzer, Assistant Attorney General, Madison, WI, for Defendants.

OPINION and ORDER

CRABB, District Judge.

This is a civil action for declaratory, injunctive and monetary relief under 42 U.S.C. § 1983 and Wisconsin law. Plaintiff Daniel Williams, who is currently detained by the State of Wisconsin as a sexually violent person under Wis. Stat. ch. 980, was granted leave to proceed on two claims: (1) defendants Helene Nelson, Steve Watters, David Thorton, Steve Schneider and Dr. William Aeytey are providing him inadequate treatment in violation of the due process clause of the Fourteenth Amendment and Wis. Stat. § 51.61 and (2) plaintiff's outgoing telephone calls, including those to lawyers, are being re-

corded, in violation of the Fourth Amendment.

Presently before the court are defendants' motion for summary judgment and plaintiff's motion to qualify Hollida Wakefield as an expert witness. Defendants filed their motion on June 17, 2005. Magistrate Judge Stephen Crocker extended the deadline for plaintiff to submit his response to defendants' motion twice. Nonetheless, plaintiff filed only a brief in response to the motion. He did not submit proposed findings of fact in response to defendants' proposed findings of fact, as this court's summary judgment procedures require. Therefore, I will treat all of defendants' proposed findings as undisputed. On the basis of those undisputed facts, I conclude that defendants are entitled to summary judgment on plaintiff's Fourteenth Amendment claim of inadequate mental health treatment. In brief, there is no evidence from which a reasonable jury could conclude that decisions concerning plaintiff's treatment are being made by unqualified individuals or that his treatment is outside the bounds of professional judgment. Even if I were to consider the only evidence plaintiff submitted, a report prepared by Hollida Wakefield, defendants would still be entitled to summary judgment because the report indicates at most a difference of opinion with respect to the treatment plaintiff is receiving. A reasonable jury would need more than a difference of opinion to find that plaintiff's right to mental health treatment is being violated. In addition, defendants are entitled to summary judgment with respect to plaintiff's state law claim of inadequate treatment under Wis. Stat. § 51.61 because he failed to file a notice of claim as required by state law. Finally, plaintiff states in his brief that he is no longer interested in pursuing his Fourth Amendment claim. Plt.'s Br., dkt. # 51, at 8. Therefore, I will grant defendants' motion for summary judgment with respect to this claim.

I find from the facts proposed by defendants and unopposed by plaintiff that the following facts are material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Daniel Williams has been committed to the care and custody of the Wisconsin Department of Health and Family Services as a sexually violent person pursuant to Wis. Stat. ch. 980 since December 1995. He has been housed at the Sand Ridge Secure Treatment Center since January 2003. Defendant Helene Nelson is Secretary of the Wisconsin Department of Health and Family Services. Defendant Steve Watters is Director of the Sand Ridge Secure Treatment Center. Defendant David Thornton (Thorton in caption) is employed as the Treatment Director at Sand Ridge. Defendant Steve Schneider is the facility's Security Director and defendant William Aeytey is a staff psychiatrist at the facility.

### B. *Treatment Programs at Sand Ridge*

Sand Ridge is the primary treatment facility for patients detained pursuant to ch. 980. These patients have been found to have a mental disorder that predisposes them to sexual violence and likely to engage in acts of sexual violence if left free in the community. The facility is run by the Department of Health and Family Services and is designed to be a secure inpatient setting for the treatment of ch. 980 patients. Patients are provided the least restrictive treatment and are housed in conditions that allow the maximum amount of personal and physical freedom consistent with the facility's security concerns.

Mental health facilities use one of two common models for in-patient treatment.

In the first model, treatment is organized around the residential unit, each of which has its own dedicated clinical team. This model has advantages but fails to capture efficiencies in sharing treatment resources among units. The second model is the "treatment mall" concept in which treatment services are provided to all residential units in a distinct location, the treatment mall. The choice between residential and treatment mall models has no bearing on the degree to which treatment is individualized. Sand Ridge uses a model of treatment that is a compromise between the residential and treatment mall models. Services are provided through a treatment mall but patients are assigned generally to residential units so that all the patients on a particular unit are participating in similar treatment activities and are at a similar stage in the treatment process. This allows staff working on those units to learn more easily how to support the treatment process.

Sand Ridge offers two types of treatment for patients: sex offender treatment and general health services. The sex offender treatment program is managed by specialists in sex offender treatment and the general health services program is managed by relevantly qualified medical specialists. The facility endeavors to coordinate the treatments and officials from each treatment will have input in formulating a patients treatment plan where necessary. Conflicts between the two treatments are resolved by the involved clinicians at meetings called "Staffings."

1. *Sexually violent person treatment program*

The sex offender treatment, also called the sexually violent person treatment program, is intended to offer patients the opportunity to engage in the kind of personal changes that will lead to their release on supervision or discharge from commitment. Its focus is on modifying or mitigating the impact of the disorders that predispose individuals to commit sexually violent acts. The treatment program is designed and supervised by staff who have backgrounds in psychology and clinical social work and who have specialized in the development of treatment programs for sexual offenders. This is a normal professional background for individuals who provide these services. Sand Ridge follows usual practice by utilizing such staff. Occasionally, psychiatrists are involved in the provision of treatment designed to reduce the risk posed by sexual offenders. However, Sand Ridge's psychiatrist contributes to the planning of the sex offender treatment program by focusing on providing pharmacological treatment that will assist patients in better regulating their sex drives.

The sexually violent person treatment program is broken into four treatment tracks, each of which constitutes a complete and self-contained treatment program designed to address the needs of the patients placed in it. Each treatment track is composed of a linked series of treatment modules that take the form of defined assessment processes or some type of psycho-education, skill development or psychotherapy. Each module has defined treatment methods and objectives. Most modules are designed to accommodate groups of six to ten patients at once. The group treatment format is considered advantageous because it is cost-effective and because it facilitates a group dynamic process in which treatment is provided by the group and not solely by the therapists facilitating it. Also, because group therapy is the format in which sex offender treatment is normally provided, most of the evidence concerning the efficacy of different forms of treatment with offenders relates to group therapy.

The four tracks are defined according to the degree to which the enrolled patients display marked psychopathic traits and their level of cognitive functioning. Programs in the treatment tracks for lower functioning patients use simplified material, repetition and other adaptations to make the program intellectually accessible. Programs for higher functioning patients use more complex material that requires abstract thought and reflection. Programs for patients who display marked psychopathic traits focus on helping them minimize the extent to which these traits prevent them from participating normally in treatment. They also focus on mitigating the extent to which these traits contribute to the patients' risk of sexual violence. Only when substantial progress has been made in this respect is it useful to turn to offense-related work that addresses other factors that contribute to the risk of sexual recidivism. Programs for offenders with less marked psychopathic traits spend less time working through problems presented by the traits and proceed to working on offense-related material more quickly.

Despite the focus on group therapy, each treatment track is individualized in three ways. First, each treatment module is designed to mold itself to the needs of individual patients. Second, a patient's individual needs and response to treatment determine which modules he participates in, how much time he spends in them and which ones he is asked to repeat. Third, additional treatment services are available across all treatment tracks and are selected on the basis of a patient's needs. They include psychiatric, educational and prevocational services, occupational therapy and alcohol and drug abuse treatment. Additionally, if a patient's treatment team determines that his treatment needs are not being met, a treatment plan may be created separate from the treatment tracks. This happens rarely because the quality of treatment that is provided through the tracks is higher than the quality of treatment provided outside them.

## 2. General health services

Sand Ridge's general health services program consists of services that address a patient's other physical or mental health problems. These are problems that do not lead to civil commitment and resolution of them will not lead to release. However, they are provided pursuant to the facility's general responsibility for the well-being and treatment of its patients. The general health services provided include physician, nursing, psychiatric, dental, optometrist, x-ray, laboratory and medication dispensing services. When appropriate, patients are taken to off-site providers for more specialized services such as hospitalization or surgery. Some of the psychiatric services, such as attempting to reduce a patient's sexual preoccupation, serve the needs of both the general health services program and the sex offender treatment program.

## C. Administration of Treatment

Patient care technicians and patient care supervisors are the primary caretakers of patients. The technicians and supervisors oversee the general living conditions of patients, manage and monitor patient behavior and oversee all activities within their assigned units. In addition, they participate in the development and implementation of treatment plans and therapeutic activities for patients and the performance of security-related tasks and functions that assure a safe and secure environment. They observe, report and record pertinent data related to patients in flow sheets, progress notes and other documents.

Some decisions about patient living units, treatment, behavior and property are made by unit managers and patient

care supervisors. Sand Ridge's staff training program provides unit managers and patient care supervisors with some clinical training and they receive advice from clinically trained staff when making decisions about patients. Therefore, unit managers and patient care supervisors exercise professional judgment in making decisions regarding a patient's therapeutic environment. However, all important decisions about patients' treatment are made by treatment teams that include clinically qualified staff.

Sand Ridge's use of security staff, unit managers, patient care supervisors and technicians and clinically qualified staff is similar to that employed at other mental health facilities run by the Department of Health and Family Services such as the Mendota Mental Health Institute. The facility follows the normal practice in managing civilly committed forensic mental health patients. These individuals are offenders as well as patients and are liable to cause harm to staff, other patients or members of the general public. Security is needed to manage this risk and to insure that patients assigned by the courts to treatment do not escape. It is also a precondition for effective mental health treatment. Security personnel are not part of patient treatment teams; however, they play an indispensable part in the overall treatment program by cooperating with treatment teams to create a relatively safe and secure environment that makes treatment possible.

### D. Diagnosis of Plaintiff's Mental Disorders

#### 1. Disorders related to risk of sexual recidivism

Plaintiff has been committed under Wis. Stat. ch. 980 because he has been found likely to commit future acts of sexual violence and has been diagnosed with one or more predisposing mental disorders. Like other ch. 980 patients, he is evaluated annually to determine whether he meets the criteria for supervised release or discharge. His two most recent evaluation reports were completed by Dr. Christopher P. Snyder in September 2003 and Dr. Lori Pierquet in September 2004. Both reports indicate that plaintiff continues to possess characteristics indicative of future acts of sexual violence. One such characteristic is plaintiff's risk assessment. Both Drs. Snyder and Pierquet classified him as "High Risk" on an actuarial risk classification instrument called Static–99. This means that sexual offenders with criminal histories similar to plaintiff's have been found to re-offend sexually at a rate that meets the legal definition of "likely" to re-offend.

Additionally, Drs. Snyder and Pierquet have determined that plaintiff possesses the combination of marked psychopathic personality traits and offense-related sexual interests. This combination is associated with an especially high rate of sexual recidivism and indicates that plaintiff presents a level of risk for future sexual violence that is high relative to that shown by other ch. 980 patients. Other characteristics plaintiff possesses that are relevant to his risk and response to treatment include 1) sexual preoccupation; 2) sexual interests in female children and adolescents; 3) sexual interest in rape; 4) persistent angry and aggressive behavior; 5) impulsive, irresponsible behavior; 6) hostile and derogatory attitudes towards women; 7) disdain for rules and authority figures as expressed by persistent rule-breaking in the community, prison and Health and Family Services facilities; 8) using displays of anger to control others; and 9) using his mental health problems to excuse irresponsible behavior. Plaintiff's 2005 Treatment Progress Report characterizes the cyclical pattern of his treatment:

He has the skills to be a productive group member. However, at some point he receives feedback that he does not agree with. At that point he often becomes angry, makes a big scene over a minor issue, attempts to embarrass other patients, introduces irrelevant material, omits facts, reveals only what advances his argument, and then refuses to participate. Finally, he blames others and subsequently leaves or quits treatment.

This pattern is apparent to staff working with him and to other patients who have been in groups with him at Sand Ridge and the Wisconsin Resource Center.

With respect to plaintiff's predisposing mental disorders, Drs. Snyder and Pierquet diagnosed him as suffering mental disorders that predispose him to commit future acts of sexual violence:

Axis I: 302.20 Pedophilia, Sexually Attracted to Females, Nonexclusive Type

302.90 Paraphilia, Not Otherwise Specified (NOS), Sexually Attracted to Adolescent Females

302.90 Paraphilia, Not Otherwise Specified (NOS), Nonconsent

Axis II: 301.7 Antisocial Personality Disorder

These diagnostic categories are from the American Psychiatric Association's commonly used Diagnostic and Statistical Manual of Mental Disorders (DSM–IV). (A "Not Otherwise Specified" diagnosis means generally that the patient does not satisfy fully the DSM–IV criteria to diagnose the particular disorder. For example, depressive symptoms can present as part of an anxiety disorder not otherwise specified.) Essentially, these disorders indicate that plaintiff has persistent sexual interests in female children, female teenagers and rape. These interests predispose him to re-offend and his personality structure predisposes him to break rules, disregard others' distress and act impulsively.

Plaintiff has six sets of problems that are related to his general mental health or that predispose him to commit future acts of sexual violence. They are 1) offense-related sexual interests in children, adolescents and coercion; 2) impulsive, irresponsible and aggressive behavior and disregard for rules and authority; 3) derogatory and hostile attitudes towards specific groups of people (women, Caucasian authority figures); 4) manipulation of other people; 5) poor regulation of negative emotions, including anger, anxiety and depression; and 6) difficulty accepting negative feedback from others. These are plaintiff's major treatment needs.

### 2. Exacerbating diagnoses

In addition to these disorders, plaintiff has "exacerbating diagnoses" that are relevant to his risk of committing future acts of sexual violence. Drs. Snyder and Pierquet diagnosed additional disorders that they did not regard as predisposing him to future acts of sexual violence but which they believed impaired his self-control. They did not agree completely on plaintiff's exacerbating diagnoses, but they referred essentially to dependence or abuse of alcohol, cannabis and cocaine, all of which were seen as being in remission in Sand Ridge's controlled environment.

### 3. Defendant Aeytey's diagnoses

In the course of his duties at Sand Ridge, defendant Aeytey diagnosed plaintiff with Anxiety Disorder NOS, Dyssomnia and Mood Disorder NOS. Defendant Aeytey's diagnoses were based on plaintiff's self-reporting after two interviews. Plaintiff was diagnosed with Mood Disorder NOS because he has had periods of

depressed mood but with fewer than the five symptoms required to support a diagnosis of depression. Likewise, although he reports irritability and easy frustration as persistent symptoms, he fails to report enough symptoms to meet the full criteria for any specific anxiety disorder to be met. These disorders do not predispose plaintiff to commit future acts of sexual violence and are not the reasons why expert witnesses have advised the court handling his commitment proceedings that he meets the criteria for commitment under ch. 980. They are not the focus of the sexually violent person treatment program.

Other clinicians have diagnosed plaintiff with personality disorder NOS, paraphilia NOS and antisocial personality disorder. Antisocial personality disorder involves ignoring societal norms, laws and rules; impulsivity; irritability and aggressiveness; reckless disregard for the rights of others; deceitfulness; lack of remorse; and consistent irresponsibility. Symptoms associated with antisocial personality disorder, anxiety and depression can overlap, as in plaintiff's case. The use of medication must be restricted in duration and quantity because the risk for dependence and abuse are high in this population. The best treatment is a combination of medication and psychotherapy. The group therapy setting is cited often as being the most useful and cognitive therapy is cited as the most effective treatment.

### E. *Plaintiff's Course of Treatment*

Plaintiff has been assigned to the Corrective Thinking treatment track of the sexually violent person treatment program. This treatment track is for patients of normal intelligence with marked psychopathic traits. Plaintiff falls within this category and has been assigned appropriately to this treatment track. Part 1 of the track is designed to address impulsive, irresponsible, manipulative and aggressive behavior, disregard of rules and authority and problems with accepting feedback. Part 2 addresses offense-related sexual interests and other offense-specific factors, including attitudes towards women. The track addresses difficulty regulating negative emotions to a limited extent because deeply held emotions are not commonly found in offenders with psychopathic personality structures. The emotional life of these individuals tends to be shallow and labile. The Corrective Thinking program fits well with plaintiff's treatment needs and focuses on the factors that have led to his commitment.

The sexually violent person treatment program causes plaintiff stress because he is held accountable for his behavior, given feedback when he behaves impulsively or irresponsibly and taught how to behave more responsibly. However, a treatment environment in which there were no women or Caucasian authority figures, in which plaintiff's viewpoint was adopted by everyone and in which he acted without consequences and did not receive feedback would likely worsen the problems that contributed to his civil commitment. Also, it would not prepare him to function effectively in the outside world. If plaintiff is to make progress towards supervised release or discharge, he must learn to manage his moods and his behavior in an environment in which he is held accountable for his choices.

Plaintiff's participation in the Corrective Thinking program has been supplemented with treatment from defendant Aeytey, Sand Ridge's psychiatrist, that is designed to help with some of the negative emotions he reports. For example, defendant Aeytey prescribed Trazodone to treat plaintiff's Dyssomnia (difficulty sleeping) with mixed results. He prescribed Prozac to treat plaintiff's mood disorder and anxiety symptoms. In addition, he prescribed Clo-

nazepam and Lorazepam to help plaintiff deal with self-control issues and feelings of irritability and frustration. Plaintiff is receiving appropriate and adequate treatment for his mood, anxiety and personality disorders with a combination of medication and group therapy.

Both sexually violent person treatment program staff and Sand Ridge medical staff have exercised professional judgment in treating plaintiff. The Corrective Thinking program does not harm plaintiff physically or psychologically. Between the program and the treatment he receives from the psychiatrist, plaintiff's full range of treatment needs have been addressed.

### F. Plaintiff's Disruptive Behavior and Placement in Step Program

On July 2, 2004, plaintiff was involved in an incident with another patient during outdoor recreation time. Patient care supervisor Erin Mashak wrote a "Behavior Disposition Record" and attached a statement describing the events surrounding this incident. According to the statement, plaintiff and another patient were involved in an argument that escalated into plaintiff's exhibiting anger and aggressive behavior and spitting on the other patient. On July 8, 2004, unit manager Steve Hamilton participated in a hearing concerning the incident. At the hearing, plaintiff admitted his guilt and was placed on 30 days' unit confinement and re-assigned to level 2 of the treatment program. Plaintiff began his 30–day confinement on July 8, 2004, during which he was allowed to continue participating in all treatment and education groups, accept visitors and participate in religious programming.

Although plaintiff was scheduled to be released from confinement on August 8, 2004, he was involved in another incident of problematic behavior that included threatening staff and other disruptive behavior on July 14, 2004. Patient care su-

pervisor Kevin Garceau wrote a Behavior Disposition Record and attached a statement describing the events surrounding this incident. According to the statement, plaintiff asked to speak with Garceau after having been issued a municipal citation by the Mauston Police Department. Later, plaintiff returned to Garceau's office, stated that he was leaving the unit and packed his property. He became highly agitated when someone asked to speak with him in a multipurpose room. He referred to Garceau as a "punk ass bitch that hides behind a shirt and a liar." When plaintiff was asked to clarify what he believed was a lie, he leaned towards Garceau in a threatening posture and said, "Listen, dude, we can either fight, fuck or box, I don't care." This behavior is consistent with plaintiff's diagnosis of antisocial personality disorder. Plaintiff admitted to this conduct at a hearing on July 19, 2004.

That same day, a decision was made to remove plaintiff from his housing unit and place him on the "step program" in Unit AD, which is commonly referred to as the Secure Treatment Wing of the Initial Treatment Unit. This wing consists of four patient rooms, a day room, shower room and courtyard. It houses patients who demonstrate significant inability to control their behavior and who endanger the safety of other patients and staff. Patients in the unit are not secluded in their rooms. Unit Manager Hamilton decided to place plaintiff in Unit AD because of his escalating anger and inability to control his anger and express it in a productive manner. The transfer was necessary to maintain a safe and secure treatment environment and to provide staff an adequate opportunity to assess plaintiff's behavior.

While plaintiff was in Unit AD, he was not placed in restraints and was able to participate in religious activities, use the telephone and see visitors. He did not ask

for medication or medical help during the incident on July 14 or during his transfer to the unit and his transfer did not interfere with his treatment for anxiety or mood disorder. However, plaintiff was suspended from participation in the sexually violent person treatment program and placed in an individualized treatment program related to the behavior that had prompted his transfer.

In addition, it was determined that plaintiff should participate in the step program. This program is for patients who require a gradual return to the general population because of the severity of the incidents leading to their placement in Unit AD. Staff believed that plaintiff would benefit from this program, not only because of the July 14 incident but also because of his continuing difficulties relating to staff and other patients in a positive and non-threatening manner. Plaintiff stayed in Unit AD from July 14 to August 11, 2004, at which time he returned to his normal housing unit. At the time of his return, he had not finished the last step of the step program; however, he was allowed to finish it after his return to the general population.

On March 22, 2005, plaintiff dropped out of the sexually violent person treatment program. On June 8, 2005, he began an individualized treatment program in which he continues to participate.

### G. Notice of Claim

Plaintiff did not file a notice of claim with the Wisconsin Attorney General concerning his claim under Wis. Stat. § 51.61 in this case.

### DISCUSSION

#### A. Fourteenth Amendment

■ "It is settled that those who are confined by the state, for whatever reason, are entitled under the Constitution to food, clothing, medical care, and reasonable efforts to secure personal safety." *Cameron v. Tomes*, 990 F.2d 14, 18 (1st Cir.1993). This case involves an interest beyond these basic human needs: the right of a person detained as a sex offender to adequate treatment. The contours of this right have not been well-defined, although most courts find support for it in the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). That case involved a mentally retarded person who had been committed to a state institution and physically restrained to protect himself and others from his aggressive and violent behavior. In discussing the constitutional rights of those in the custody of the state, the Court drew a distinction between persons detained under civil commitment and those incarcerated pursuant to criminal convictions. Speaking in general terms, the Court stated that persons civilly committed are entitled to "more considerate treatment and conditions of confinement" than convicted criminals. *Id.* at 322, 102 S.Ct. 2452. More specifically, the Court held that under the due process cause of the Fourteenth Amendment, an institutionalized person in state custody "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id.* at 324, 102 S.Ct. 2452.

*Youngberg* tied the "right to treatment" to the provision of reasonably safe living conditions and the avoidance of bodily restraints. Nonetheless, courts have applied its holding to claims that civilly detained persons are receiving improper treatment for their mental disorders. That is the situation here. The present case involves a person detained by Wisconsin under its sexually violent persons statute. As the Wisconsin Supreme Court has noted, the

purposes of Wis. Stat. ch. 980 are "to protect the public and to provide concentrated treatment to convicted sexually violent persons." *State v. Carpenter*, 197 Wis.2d 252, 258–59, 541 N.W.2d 105, 107 (1995). Because the statute aims primarily to isolate and treat sex offenders, due process requires that the conditions and duration of plaintiff's confinement bear some reasonable relation to those purposes. *Seling v. Young*, 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001). This deferential standard indicates that states retain great flexibility in designing and implementing treatment programs. *Kansas v. Hendricks*, 521 U.S. 346, 368 n. 4, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). It reflects also the judgment that courts are ill-equipped to make decisions regarding the treatment of the mentally ill and should show deference to treatment decisions made by qualified professionals. *Youngberg*, 457 U.S. at 322, 102 S.Ct. 2452. In light of these considerations, due process requires only that treatment decisions be the product of professional judgment. *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir.2003).

█ In determining whether the state has met its obligation to provide constitutionally adequate treatment, "decisions made by the appropriate professional are entitled to a presumption of correctness." *Youngberg*, 457 U.S. at 324, 102 S.Ct. 2452. Thus, to withstand summary judgment, plaintiff must introduce evidence from which a reasonable jury could conclude that a treatment decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452.

█ In granting plaintiff leave to proceed on his Fourteenth Amendment claim, I stated that two of his allegations were sufficient to suggest that his right to minimally adequate treatment was being infringed. First, plaintiff alleged that individuals who lacked training or expertise in the mental health field were making decisions concerning his treatment. Second, he alleged that defendant Aeytey had diagnosed him as suffering from anxiety and mood disorders and depression but that he was not receiving appropriate treatment for these conditions. I will address each of these allegations in turn.

1. *Persons making treatment decisions*

In his complaint, plaintiff alleged that decisions regarding his treatment were being made by unit managers and patient care supervisors who had no medical or clinical training. The undisputed facts provide a more complete picture of plaintiff's treatment at Sand Ridge. They indicate that decisions concerning plaintiff's treatment are the product of professional judgment.

The following facts are undisputed. Sand Ridge's sexually violent person treatment program is managed by persons who specialize in treating sex offenders. They have backgrounds in either psychology or clinical social work as well as experience in the development of treatment programs for sex offenders. This is a normal professional background for individuals providing these services and Sand Ridge follows accepted practice by utilizing such staff. In addition to the staff responsible for designing the treatment program, Sand Ridge's psychiatrist contributes to the treatment planning process by determining whether pharmacological treatment will help a patient control his sex drive. In addition to sex offender treatment, Sand Ridge has a general health services program that is managed by relevantly qualified specialists. Defendant Aeytey, a psychiatrist, has diagnosed plaintiff with anxiety disor-

der, dyssomnia and mood disorder and has prescribed medications to treat these conditions.

The sex offender treatment program is divided into four treatment tracks, each of which is a complete, self-contained program. Patients are assigned to a track according to the degree to which they display marked psychopathic traits and according to their level of cognitive functioning. Plaintiff has been assigned to the Cognitive Thinking track because two doctors (Snyder and Pierquet) have found that he exhibits marked psychopathic traits. Treatment within each track is oriented around groups of six to ten patients rather than individually. Therapists facilitate the group sessions. Group therapy is the norm for sex offender treatment because it is cost-effective and because it encourages a group dynamic in which treatment is provided by the group instead of a therapist. However, each treatment track is adapted to its members in several ways. For example, psychiatric services and drug abuse treatment are available as needed on an individual basis. Furthermore, on rare occasions, a patient may be removed from group therapy and placed in an individualized treatment program.

Patient care technicians and patient care supervisors assume primary responsibility for patient care at Sand Ridge. They monitor and record patient behavior, maintain living conditions and maintain security. As members of treatment teams, they participate in the development and implementation of treatment plans and therapeutic activities. Unit managers and patient care supervisors make some decisions regarding treatment. However, they receive clinical training and consult clinically trained staff in the decision-making process. All important treatment decisions are made by treatment teams that include clinically qualified staff. Security staff are not part of treatment teams but their maintenance of a secure environment is essential to the efficacy of treatment.

These undisputed facts indicate that decisions concerning plaintiff's treatment have been made by qualified professionals. He was placed in the Corrective Thinking treatment track on the recommendation of Drs. Snyder and Pierquet, each of whom has evaluated him. According to these doctors, plaintiff continues to display psychopathic personality traits and offense-related sexual interests. Plaintiff's sex offender treatment is supplemented by several medications prescribed by defendant Aeytey, a psychiatrist. These medications are designed to treat his mental disorders. There is no indication that Drs. Snyder and Pierquet and defendant Aeytey are unqualified to make these decisions regarding plaintiff's care. *Youngberg,* 457 U.S. at 323 n. 30, 102 S.Ct. 2452 (for purpose of professional judgment standard, "professional" is "a person competent, whether by education, training or experience, to make the particular decision at issue"). Certainly plaintiff has introduced no evidence to call into question the qualifications of these individuals. Because the undisputed facts indicate that these individuals exercised their professional judgment in determining the proper course of treatment for plaintiff, the requirements of due process have been met.

This conclusion is not altered by the fact that unit managers, patient care technicians and patient care supervisors are involved in making some decisions regarding plaintiff's treatment. The professional judgment standard incorporates the idea that not every decision that affects an institutionalized person's treatment must be made by a doctor. *Youngberg,* 457 U.S. at 323 n. 30, 102 S.Ct. 2452 ("Long-term treatment decisions normally should be made by persons with degrees in medicine

or nursing, or with appropriate training in psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons."). The record in this case indicates that doctors made the "long-term" treatment decisions concerning plaintiff's placement in the Corrective Thinking treatment track and the medications he is prescribed. Unit managers, patient care supervisors and technicians are involved in day-to-day monitoring of patient behavior and in responding to incidents of misbehavior. However, it is undisputed that they receive some clinical training and often consult clinically trained staff when making decisions that affect treatment. As an example, the record indicates that patient care supervisors Erin Mashak and Kevin Garceau and unit manager Steve Hamilton were involved in disciplining plaintiff for two incidents in which he acted inappropriately. Hamilton decided to place plaintiff in a step program after the second incident because staff believed plaintiff would benefit from the program.

Against these facts, plaintiff has only his allegation that treatment decisions are made by unqualified individuals. To defeat a motion for summary judgment, however, a non-moving party must do more than rely on the allegations in his complaint; "he must present specific facts to show that a genuine issue of material fact exists." *Geschke v. Air Force Ass'n*, 425 F.3d 337, 342 (7th Cir.2005). Plaintiff has not introduced any evidence from which a reasonable jury could conclude that decisions concerning his treatment departed substantially from the decisions that would be made by an accepted professional. Therefore, I will move on to plaintiff's

second allegation, that he is receiving inappropriate treatment for the mental disorders diagnosed by defendant Aeytey.

### 2. Treatment for mental disorders

Defendants argue that plaintiff's due process claim is based in part on his allegation that the sex offender treatment he is receiving is inadequate and potentially harmful to him physically and psychologically. Plaintiff disclaims this argument in his brief, however. Plt.'s Br., dkt. # 51, at 3. Instead, he contends that he has not received specialized group treatment ordered by defendant Aeytey and that his "mental health needs are not the same needs that can be addressed by the standardized Sex Offender Treatment program nor the Corrective Thinging [sic] program at SRSTC." *Id.* at 3–4. He insists that he wants treatment but that he is given disciplinary reports instead. He contends also that he has inquired about enrolling in an anger management program but been refused admission for unknown reasons.

Because plaintiff failed to submit proposed findings of fact in support of these arguments, they are merely unsubstantiated allegations insufficient to withstand summary judgment. There is no evidence in the record to support plaintiff's allegation that defendants have ignored Aeytey's recommendation that plaintiff participate in group treatment. Likewise, there are no facts to support plaintiff's allegation that he 1) inquired about participating in an anger management class and 2) was denied permission to do so. (Even if there were facts in the record to support this allegation, defendants would still be entitled to summary judgment because the due process clause does not require treatment providers to accede to every demand from a patient.)

Finally, there is plaintiff's allegation that his treatment is inadequate because he received disciplinary reports and was placed in the step program in the secure treatment wing at Sand Ridge after the two incidents of misbehavior in July 2004. Plaintiff argues that these outbursts indicate that his treatment is not working and that the proper response is not discipline but rather an alteration of his treatment. He contends further that as long as he is periodically shuffled out of sex offender treatment and placed in individualized treatment programs, he will not make any progress necessary to receive supervised release. In support of his arguments, plaintiff cites the only evidence he has introduced into the record, a report by a psychologist named Hollida Wakefield. I need not consider the contents of this report because plaintiff did not make any of its contents the subject of proposed findings of fact. However, in the interest of thoroughness, I will summarize briefly the contents of the report and discuss why, even had I considered it, defendants would still be entitled to summary judgment.

According to the report, Wakefield based her conclusions on her interview of plaintiff, tests she conducted on him and records obtained from Sand Ridge. After recounting plaintiff's troubled childhood and his history of nonsexual and sexually-related criminal offenses, Wakefield notes that plaintiff did not do well in a sex offender treatment program at the Wisconsin Resource Center because he "was said to be openly confrontational and to show poor anger control" and because he had "problems with anger and mood swings." Report of Hollida Wakefield, dkt. # 49, at 6. After being transferred to Sand Ridge in January 2003, plaintiff continued to have problems with anger and dropped out of group therapy. Under the heading "Observations," Wakefield notes that plaintiff

wants treatment for his anxiety, agitation, difficulties controlling his anger, and panic attacks. He said that these have not been addressed outside of medication at either WRC or SRSTC despite his efforts to get help in addition to medication for these. He wants psychotherapy for these problems and would like to be able to see Dr. Aeytey more regularly for monitoring his medication. He also wants substance abuse treatment, which has not been made available to him. He said that he had put in a request two months ago to see Dr. Aeytey but that he hadn't been given an appointment. He does not want to depend upon medication to control his moods, anger, and anxiety.

*Id.* at 9–10. Wakefield describes plaintiff as "likely to be angry, irritable, impulsive, manipulative, demanding, disruptive, resentful, argumentative, and suspicious" and suggests that he "is showing the signs of an anxiety disorder." *Id.* at 10. In addition, she rates him as "likely to have the characteristics of a psychopath." *Id.* at 11. She diagnoses him with anxiety disorder, mood disorder, alcohol dependence, cannabis dependence, cocaine abuse and antisocial personality disorder and states that he has some traits consistent with a borderline personality disorder. She states further that plaintiff does not meet the criteria for paraphilia or pedophilia and that there is no evidence that he is "aroused by sexual encounters that are clearly nonconsensual." *Id.* at 14.

In terms of treatment, Wakefield's report indicates that any treatment plan must account for plaintiff's comorbidity (the fact that he meets the criteria for more than one psychiatric disorder). She suggests that Sand Ridge's sex offender treatment program might not be appropriate for comorbid individuals and that plaintiff should receive treatment geared to-

wards addressing his problems with anger, anxiety and agitation instead of being removed from treatment for displaying these emotions. *Id.* at 17. She suggests further that

> the most effective and appropriate treatment for Mr. Williams would be individual therapy with a psychologist skilled in cognitive-behavioral techniques who provided cognitive-behavioral therapy for Mr. Williams' anger, anxiety, depression, and panic attacks while coordinating his treatment with Dr. Aeytey and Mr. Williams' medications.

*Id.* at 17–18. Wakefield states also that plaintiff needs to address his substance abuse problems. Her report concludes as follows:

> But in order for Mr. Williams to [make significant progress in treatment], he must receive effective treatment. If he is not able to receive effective treatment but instead is periodically terminated from treatment whenever he has anger outbursts or acts disruptively in group, he will never make sufficient progress in treatment to be recommended for supervised release. He therefore will be, in effect, warehoused indefinitely in preventive detention.

*Id.* at 19.

Even if I were to credit Wakefield's conclusions, they are insufficient to raise a genuine issue of material fact whether plaintiff's due process rights are being violated for two reasons. First, the Constitution does not forbid the use of discipline when civilly detained persons violate rules or endanger other patients or staff. Institutions that house persons detained under civil commitment have the same interest as prisons in keeping their residents and staff safe. In another case involving ch. 980 patients, the Court of Appeals for the Seventh Circuit stated that "[t]o the extent that [patients] are uncontrollably violent, and thus pose a danger to others, Wisconsin is entitled to hold them in segregation for that reason alone; preserving the safety of the staff and other detainees takes precedence over medical goals." *West,* 333 F.3d at 748. In this case, it is undisputed that plaintiff's transfer to Sand Ridge's secure wing in July 2004 was necessary to maintain a safe and secure treatment environment. Additionally, it should be noted that the transfer did not interfere with treatment of plaintiff's anxiety and mood disorders. The fact that he was suspended from participation in the sexually violent person treatment program because of his transfer is not a matter of constitutional concern. I note further that while plaintiff was housed in the secure wing, he was placed in a step program designed specifically for individuals who have difficulties with staff or other patients. There is no evidence to suggest that his placement in the step program was anything but the result of professional judgment.

The second reason why Wakefield's conclusions are insufficient to withstand summary judgment is that a mere difference of opinion among medical professionals concerning the proper course of treatment is insufficient to overcome the presumption of correctness that attaches to the treatment decisions made by Sand Ridge staff regarding plaintiff. In her report, Wakefield concludes that plaintiff might respond better to treatment that 1) occurs one-on-one rather than in a group setting and 2) is designed to treat his multiple mental disorders. In addition, she states that disciplining plaintiff for his angry outbursts and confrontational behavior is not the most effective way to eliminate them. Accepting these conclusions as true, they indicate only a difference of professional opinion concerning treatment. For liability to attach under the professional judgment standard, plain-

tiff must show that the decisions made by defendants are so beyond the pale that it is appropriate to conclude that they are not the result of professional judgment. Wakefield's report does not meet this standard. It provides only another possible course of treatment. Nothing in it suggests that the treatment plaintiff is receiving for his mental disorders, which consists primarily of medication, deviates from professional norms so much that it cannot be said to be product of professional judgment. It is obvious that plaintiff disagrees with decisions that have been made concerning his treatment. However, this court lacks the constitutional authority to order a different course of treatment merely because plaintiff desires it or might be better served by it. Because the undisputed facts show that defendants are exercising their professional judgment in providing treatment for plaintiff, they are entitled to summary judgment on his due process claim.

### B. *Wis. Stat. § 51.61*

■ Defendants argue that plaintiff's state law claims under Wis. Stat. § 51.61 must be dismissed because plaintiff failed to file a notice of injury under Wis. Stat. § 893. 82(3), which provides:

> Except as provided in sub. (5m), no civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties, ... unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names

of persons involved, including the name of the state officer, employee or agent involved.

It is undisputed that plaintiff has not filed a Notice of Claim with the attorney general in accordance with Wis. Stat. § 893.82 regarding his state law claim. "Where the plaintiff has failed to comply with this notice of claim statute, the court lacks jurisdiction to hear the claim." *Saldivar v. Cadena,* 622 F.Supp. 949, 959 (W.D.Wis. 1985) (noting that Wis. Stat. § 893.82 "imposes a condition precedent to the right to maintain an action"). Therefore, I will grant defendants' motion for summary judgment as it relates to plaintiff's state law claim.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED in its entirety. Plaintiff's motion to qualify Hollida Wakefield as an expert witness is DENIED as moot. The clerk of court is directed to enter judgment for defendants and close this case.