TINDER, Circuit Judge.
The plaintiffs were convicted of sex crimes and completed their sentences years ago, but they remain in state custody as civil detainees pursuant to Illinois’ Sexually Violent Persons Commitment Act, 725 ILCS 207/1-99. Proceeding pro se, and then with the assistance of appointed counsel, the plaintiffs asserted a variety of claims under 42 U.S.C. § 1983 alleging constitutional problems with the conditions of their confinement at Rushville Treatment and Detention Center. On appeal, only two issues remain: (1) whether due process requires input from health professionals prior to restricting opportunities for in-person association among Rushville’s six 75-person units and (2) whether the *881 First Amendment entitles detainees to use the facility’s internal mail system instead of the U.S. mail to exchange letters with other detainees. The district court granted summary judgment for the defendants. We review the district court’s grant of summary judgment de novo, viewing the facts in a light most favorable to the nonmovant, and drawing all reasonable inferences in that party’s favor. Kuhn v. Goodlow, 678 F.3d 552, 555 (7th Cir.2012). Summary judgment is appropriate “when the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.” Id. (quoting Fed.R.Civ.P. 56(a)). We affirm.
The Sexually Violent Persons Commitment Act authorizes detention of individuals who have been adjudicated a “sexually violent person” or “SVP,” which requires, among other things, evidence that the person “suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.” 725 ILCS 207/5(f). Civil commitment of this sort lasts until the detainee is “no longer a sexually violent person.” 725 ILCS 207/40(a). Commitment under the Act is civil and so may be for purposes such as incapacitation and treatment, but not punishment. See, e.g., Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir.2003). And, as a general matter, “[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.” Youngberg v. Romeo, 457 U.S. 307, 321-22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).
The plaintiffs do not allege that they are being unconstitutionally punished, but, as mentioned, that their constitutional rights are nonetheless violated by the limitations imposed on their ability to interact with other detainees, in-person and by letter. These claims appear to be a product of the plaintiffs’ dissatisfaction with Rushville’s basic setup. Before Rushville, where Illinois’ SVP population moved in 2006, SVPs were held at a facility in Joliet that allowed them to mix more freely. Even if that helps us understand the plaintiffs’ claims, that contrast is not material; the issues before us concern the current situation at Rushville.
The Rushville facility is divided into six units — Alpha, Baker, Charlie, Delta, Echo, and Fox — and each unit has three living areas (“pods”), except Fox, which has four. Approximately 25 detainees live in each pod. At the suggestion of clinical staff, the units house different types of detainees: Alpha and Baker are for detainees who accept treatment, and Charlie and Delta are for those who do not; Echo is for detainees with special medical needs; Fox is for detainees with “chronic behavior problems, typically some type of aggression or intimidating violent behavior potential.” All detainees are in their pods most of the time — in their rooms or the pod’s common room. But a detainee’s social universe does not end at his pod’s edge. For an hour each day, detainees may go to the gym as a unit. Also as a unit, detainees have a daily hour or two of outdoor “yard time.” On weekends, units are allowed to mingle during yard time — Alpha with Baker; Charlie with Delta and Echo; and sometimes Echo with Fox. There is group treatment for several hours each week, and groups are not set by unit. Outside the normal weekly schedule, detainees from different units can meet and socialize at bimonthly movie nights, three summer picnics, a band performance, and a Christmas concert. And, finally, there are occasional chance encounters with detainees from other units during transport to outside appointments. So, setting aside special events and chance encounters, Rushville detainees have opportunities to *882 associate in-person with approximately one-hundred and fifty detainees each week. As for written communications inside Rushville, detainees are allowed to pass letters within their units, but they have to use the U.S. mail to write to detainees in other units.
In-Person Association Claim. The plaintiffs assert a right to have the limits on their opportunities to associate face-to-face with detainees in other units set by a health professional. Health professionals decide how detainees are grouped in particular units and pods, but security officials have set the limits on association among units — for example, that Baker will not have yard time with Delta or Echo. The plaintiffs’ expert explained that one of the purposes of sex offender treatment is to teach appropriate social interaction. To do that, he thinks that detainees should be exposed to the kind of “spontaneous” social interactions they will face outside the facility rather than the limited interactions they are permitted within their pods and units. The plaintiffs’ expert recognizes that restrictions will be necessary for security, but he believes that the current restrictions are too severe and fall below minimum standards for sex offender treatment.
The plaintiffs’ in-person association claim rests on Youngberg. In Young-berg, the Supreme Court considered the substantive due process rights of involuntarily committed mentally retarded persons and held that they have a right to “conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these conditions.” 457 U.S. at 324, 102 S.Ct. 2452. The Court recognized that these rights are in tension, because, for example, safety and training may require restraint, and so balancing is required. But whether the state properly balanced rights to safety, care, freedom from restraint, and training was not left to the “unguided discretion of a judge or jury.” Id. at 321, 102 S.Ct. 2452. Rather, the constitutional requirement is that professional judgment be exercised. In particular, decisions about what constitutes “minimally adequate training” must be made by an appropriate professional. If that is done, the professional’s treatment decision will be presumptively valid and offend the Constitution only if it is such “a substantial departure from accepted professional judgment, practice or standards as to demonstrate” that it was not, in fact, based on professional judgment. Id. at 323, 102 S.Ct. 2452. Extending Youngberg to cover those committed because they are sexually violent, we summarized the treatment rule this way: “(a) committed persons are entitled to some treatment, and (b) what that treatment entails must be decided by mental-health professionals.” Allison, 332 F.3d at 1081.
The plaintiffs in this case wisely do not argue that the limits on interaction among some of the units is intended to inflict punishment, see id. at 1079, or is not a legitimate security measure, see West v. Schwebke, 333 F.3d 745 (7th Cir.2003), and understand that they can prevail only if the contested restrictions on association are treatment decisions. As explained, treatment decisions require an exercise of professional judgment, and there is no serious argument that the contested restrictions are the product of that — the absence of a protest by health professionals is not an exercise of professional judgment subject to deference under Youngberg. It cannot be, however, that all decisions that have an impact on detainees are treatment decisions. Many policies and practices at a facility like Rushville reflect what the state can afford, what the site will allow, and what security requires; the fact that such policies and practices may frame op *883 portunities for treatment does not make them treatment. Of course, security or other administrative decisions could so interfere with treatment that the conditions of confinement no longer “bear some reasonable relation to the purpose for which persons are committed,” Seling v. Young, 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), and that could violate due process. That, however, is not this case.
Simply put, “Youngberg holds that, under the due process clause, detainees are entitled to non-punitive programs designed using the exercise of professional judgment,” Allison, 332 F.3d at 1080; it does not hold that every aspect of civil commitment must be evaluated as a treatment program. In Allison, for example, SVPs claimed their commitment violated due process because (1) they were confined at a prison and (2) their treatment involved group sessions in which they were forced to confess their crimes. Id. at 1078. The second claim was analyzed according to the Youngberg “professional judgment” rule and was rejected because professional judgment was in fact exercised; the first claim, by contrast, was not about treatment, but only whether confinement in a prison amounted to punishment — no mental health professional had to endorse that decision or decide how much contact the SVPs could have with the general prison population. Id. at 1079. West v. Schwebke, 333 F.3d at 745, illustrates the same idea. In West, SVPs were placed in “therapeutic seclusion” for long stretches — 82 days for one detainee — -and were allowed out for only an hour a day and not at all on weekends. Id. at 747. The Youngberg question was whether this “treatment” could be defended either on security grounds or as an exercise of professional judgment. In affirming the denial of summary judgment for the defendants, we emphasized that “if at trial defendants can establish that their use of seclusion was justified on security grounds, they will prevail without regard to the question whether extended seclusion is justified as treatment.” Id. at 748. A justified security policy is not, therefore, properly viewed as a treatment program that must be supported by an exercise of professional judgment. And that is so even if the security policy limits opportunities for treatment. In this ease, the plaintiffs do not argue that the limit on interaction among units is not a justified security decision, but only that the decision had to be made — in the first instance at least — by a health professional. That, however, is wrong: Security decisions do not violate Youngberg just because they restrict treatment options. As here, where there has been no showing (or even an argument) that a security decision is unjustified on security grounds, we will not leap to the conclusion that its impact on treatment is enough to make it a treatment decision subject to Youngberg’s rule.
Internal Mail Claim. Detainees are permitted to pass notes and letters within their units. If a detainee wants to send a letter to a detainee in another unit, he must use the U.S. mail. The plaintiffs argue that the First Amendment entitles them to use Rushville’s internal mail system, sometimes called “inner mail,” for that purpose. Currently, inner mail is used for staff to communicate with each other and for detainees to communicate with staff, but detainees are not allowed to use it to communicate with each other. We will assume that from the detainees perspective inner mail would be at least as good as U.S. mail and potentially much nicer. The U.S. mail can be slow and stamps cost 45 cents; inner mail could be fast and free (for the detainees, at least).
The parties disagree about the legal standard applicable to this First Amendment claim. The defendants suggest, im *884 plausibly, that the plaintiffs would be entitled to an injunction only if Rushville’s mail policy shocks the conscience by, for instance, inflicting punishment. The plaintiffs recommend that we apply the standard set out in Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987): “when a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.” The plaintiffs recognize that this standard is used for prisoners’ claims, and so believe that a less stringent standard should apply to them as civil detainees, but they do not think we need to articulate that less stringent standard because, as they see it, they win under Turner. That is the standard the district court applied, and it is the standard that other district courts in this circuit have applied to constitutional claims by civil detainees. Smego v. Ashby, No. 10-CV-3240, 2011 WL 6140661, at *3 (C.D.Ill. Dec. 9, 2011); Hedgespeth v. Bartow, No. 09-cv-246, 2010 WL 2990897, at *6 (W.D.Wis. July 27, 2010).
Because Turner tells courts to consider the challenged regulation in relation to the government’s legitimate interests, it would not be too difficult to adapt its standard for claims by civil detainees. To do so, courts would only have to recognize the different legitimate interests that governments have with regard to prisoners as compared with civil detainees. In this appeal, however, we do not have to decide whether and, if so, how to make such an adjustment to the Turner standard. Any standard that we would apply, including Turner, would require that the challenged policy at least “impinge” on the detainees’ constitutional rights. See Turner, 482 U.S. at 89, 107 S.Ct. 2254. Here, there is no impingement, but only a demand for a better way to communicate with detainees outside their units — a way better than the U.S. mail. There is, after all, a system in place for communication among staff and for detainee communication with staff, and the plaintiffs see no reason that they should not be allowed to use that system for their own purposes. But that is nothing more than a recommendation for the officials at Rushville to consider — a suggestion about how operations at the facility could be improved; it does not state a constitutional claim. As maligned as the United States Postal Service may be, there is no First Amendment right to a means of sending letters superior to the one it provides.
Affirmed.