# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3373

CHRISTOPHER LANE, KRISTOPHER KRAS, and TIMMY LURZ,

*Plaintiffs-Appellants,*

*v.*

TARRY WILLIAMS, FOREST ASHBY, and SHAN JUMPER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:07-cv-03332-HAB-CHE—**Harold A. Baker**, *Judge.*

ARGUED JUNE 4, 2012—DECIDED AUGUST 24, 2012

Before KANNE, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* The plaintiffs were convicted of sex crimes and completed their sentences years ago, but they remain in state custody as civil detainees pursuant to Illinois' Sexually Violent Persons Commitment Act, 725 ILCS 207/1-99. Proceeding pro se, and then with the assistance of appointed counsel, the plaintiffs asserted a variety of claims under 42 U.S.C.

§ 1983 alleging constitutional problems with the conditions of their confinement at Rushville Treatment and Detention Center. On appeal, only two issues remain: (1) whether due process requires input from health professionals prior to restricting opportunities for in-person association among Rushville's six 75-person units and (2) whether the First Amendment entitles detainees to use the facility's internal mail system instead of the U.S. mail to exchange letters with other detainees. The district court granted summary judgment for the defendants. We review the district court's grant of summary judgment de novo, viewing the facts in a light most favorable to the nonmovant, and drawing all reasonable inferences in that party's favor. *Kuhn v. Goodlow*, 678 F.3d 552, 555 (7th Cir. 2012). Summary judgment is appropriate "when the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). We affirm.

The Sexually Violent Persons Commitment Act authorizes detention of individuals who have been adjudicated a "sexually violent person" or "SVP," which requires, among other things, evidence that the person "suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f). Civil commitment of this sort lasts until the detainee is "no longer a sexually violent person." 725 ILCS 207/40(a). Commitment under the Act is civil and so may be for purposes such as incapacitation and treatment, but not punishment. *See, e.g., Allison v. Snyder*, 332 F.3d 1076, 1079 (7th

Cir. 2003). And, as a general matter, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

The plaintiffs do not allege that they are being unconstitutionally punished, but, as mentioned, that their constitutional rights are nonetheless violated by the limitations imposed on their ability to interact with other detainees, in-person and by letter. These claims appear to be a product of the plaintiffs' dissatisfaction with Rushville's basic setup. Before Rushville, where Illinois' SVP population moved in 2006, SVPs were held at a facility in Joliet that allowed them to mix more freely. Even if that helps us understand the plaintiffs' claims, that contrast is not material; the issues before us concern the current situation at Rushville.

The Rushville facility is divided into six units—Alpha, Baker, Charlie, Delta, Echo, and Fox—and each unit has three living areas ("pods"), except Fox, which has four. Approximately 25 detainees live in each pod. At the suggestion of clinical staff, the units house different types of detainees: Alpha and Baker are for detainees who accept treatment, and Charlie and Delta are for those who do not; Echo is for detainees with special medical needs; Fox is for detainees with "chronic behavior problems, typically some type of aggression or intimidating violent behavior potential." All detainees are in their pods most of the time—in their rooms or the pod's common room. But a detainee's social universe

does not end at his pod's edge. For an hour each day, detainees may go to the gym as a unit. Also as a unit, detainees have a daily hour or two of outdoor "yard time." On weekends, units are allowed to mingle during yard time—Alpha with Baker; Charlie with Delta and Echo; and sometimes Echo with Fox. There is group treatment for several hours each week, and groups are not set by unit. Outside the normal weekly schedule, detainees from different units can meet and socialize at bimonthly movie nights, three summer picnics, a band performance, and a Christmas concert. And, finally, there are occasional chance encounters with detainees from other units during transport to outside appointments. So, setting aside special events and chance encounters, Rushville detainees have opportunities to associate in-person with approximately one-hundred and fifty detainees each week. As for written communications inside Rushville, detainees are allowed to pass letters within their units, but they have to use the U.S. mail to write to detainees in other units.

*In-Person Association Claim.* The plaintiffs assert a right to have the limits on their opportunities to associate face-to-face with detainees in other units set by a health professional. Health professionals decide how detainees are grouped in particular units and pods, but security officials have set the limits on association among units—for example, that Baker will not have yard time with Delta or Echo. The plaintiffs' expert explained that one of the purposes of sex offender treatment is to teach appropriate social interaction. To do that, he thinks that detainees should be exposed to the kind of "spontane-

ous" social interactions they will face outside the facility rather than the limited interactions they are permitted within their pods and units. The plaintiffs' expert recognizes that restrictions will be necessary for security, but he believes that the current restrictions are too severe and fall below minimum standards for sex offender treatment.

The plaintiffs' in-person association claim rests on *Youngberg.* In *Youngberg,* the Supreme Court considered the substantive due process rights of involuntarily committed mentally retarded persons and held that they have a right to "conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these conditions." 457 U.S. at 324. The Court recognized that these rights are in tension, because, for example, safety and training may require restraint, and so balancing is required. But whether the state properly balanced rights to safety, care, freedom from restraint, and training was not left to the "unguided discretion of a judge or jury." *Id.* at 321. Rather, the constitutional requirement is that professional judgment be exercised. In particular, decisions about what constitutes "minimally adequate training" must be made by an appropriate professional. If that is done, the professional's treatment decision will be presumptively valid and offend the Constitution only if it is such "a substantial departure from accepted professional judgment, practice or standards as to demonstrate" that it was not, in fact, based on professional judgment. *Id.* at 323. Extending *Youngberg* to cover those committed because they are sexually violent, we sum-

marized the treatment rule this way: "(a) committed persons are entitled to some treatment, and (b) what that treatment entails must be decided by mental-health professionals." *Allison*, 332 F.3d at 1081.

The plaintiffs in this case wisely do not argue that the limits on interaction among some of the units is intended to inflict punishment, *see id.* at 1079, or is not a legitimate security measure, *see West v. Schwebke*, 333 F.3d 745 (7th Cir. 2003), and understand that they can prevail only if the contested restrictions on association are *treatment* decisions. As explained, treatment decisions require an exercise of professional judgment, and there is no serious argument that the contested restrictions are the product of that—the absence of a protest by health professionals is not an exercise of professional judgment subject to deference under *Youngberg.* It cannot be, however, that *all* decisions that have an impact on detainees are treatment decisions. Many policies and practices at a facility like Rushville reflect what the state can afford, what the site will allow, and what security requires; the fact that such policies and practices may frame opportunities for treatment does not make them treatment. Of course, security or other administrative decisions could so interfere with treatment that the conditions of confinement no longer "bear some reasonable relation to the purpose for which persons are committed," *Seling v. Young,* 531 U.S. 250, 265 (2001), and that could violate due process. That, however, is not this case.

Simply put, "*Youngberg* holds that, under the due process clause, detainees are entitled to non-punitive

programs designed using the exercise of professional judgment," *Allison*, 332 F.3d at 1080; it does not hold that every aspect of civil commitment must be evaluated as a treatment program. In *Allison*, for example, SVPs claimed their commitment violated due process because (1) they were confined at a prison and (2) their treatment involved group sessions in which they were forced to confess their crimes. *Id.* at 1078. The second claim was analyzed according to the *Youngberg* "professional judgment" rule and was rejected because professional judgment was in fact exercised; the first claim, by contrast, was not about treatment, but only whether confinement in a prison amounted to punishment—no mental health professional had to endorse that decision or decide how much contact the SVPs could have with the general prison population. *Id.* at 1079. *West v. Schwebke*, 333 F.3d at 745, illustrates the same idea. In *West*, SVPs were placed in "therapeutic seclusion" for long stretches—82 days for one detainee—and were allowed out for only an hour a day and not at all on weekends. *Id.* at 747. The *Youngberg* question was whether this "treatment" could be defended *either* on security grounds or as an exercise of professional judgment. In affirming the denial of summary judgment for the defendants, we emphasized that "if at trial defendants can establish that their use of seclusion was justified on security grounds, they will prevail without regard to the question whether extended seclusion is justified as treatment." *Id.* at 748. A justified security policy is not, therefore, properly viewed as a treatment program that must be supported by an exercise of professional judgment.

And that is so even if the security policy limits opportunities for treatment. In this case, the plaintiffs do not argue that the limit on interaction among units is not a justified security decision, but only that the decision had to be made—in the first instance at least—by a health professional. That, however, is wrong: Security decisions do not violate *Youngberg just because* they restrict treatment options. As here, where there has been no showing (or even an argument) that a security decision is unjustified on security grounds, we will not leap to the conclusion that its impact on treatment is enough to make it a treatment decision subject to *Youngberg*'s rule.

*Internal Mail Claim.* Detainees are permitted to pass notes and letters within their units. If a detainee wants to send a letter to a detainee in another unit, he must use the U.S. mail. The plaintiffs argue that the First Amendment entitles them to use Rushville's internal mail system, sometimes called "inner mail," for that purpose. Currently, inner mail is used for staff to communicate with each other and for detainees to communicate with staff, but detainees are not allowed to use it to communicate with each other. We will assume that from the detainees perspective inner mail would be at least as good as U.S. mail and potentially much nicer. The U.S. mail can be slow and stamps cost 45 cents; inner mail could be fast and free (for the detainees, at least).

The parties disagree about the legal standard applicable to this First Amendment claim. The defendants suggest, implausibly, that the plaintiffs would be entitled

to an injunction only if Rushville's mail policy shocks the conscience by, for instance, inflicting punishment. The plaintiffs recommend that we apply the standard set out in *Turner v. Safley*, 482 U.S. 78, 89 (1987): "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The plaintiffs recognize that this standard is used for prisoners' claims, and so believe that a less stringent standard should apply to them as civil detainees, but they do not think we need to articulate that less stringent standard because, as they see it, they win under *Turner.* That is the standard the district court applied, and it is the standard that other district courts in this circuit have applied to constitutional claims by civil detainees. *Smego v. Ashby*, No. 10-CV-3240, 2011 WL 6140661, at *3 (C.D. Ill. Dec. 9, 2011); *Hedgespeth v. Bartow*, No. 09-cv-246, 2010 WL 2990897, at *6 (W.D. Wis. July 27, 2010).

Because *Turner* tells courts to consider the challenged regulation in relation to the government's legitimate interests, it would not be too difficult to adapt its standard for claims by civil detainees. To do so, courts would only have to recognize the different legitimate interests that governments have with regard to prisoners as compared with civil detainees. In this appeal, however, we do not have to decide whether and, if so, how to make such an adjustment to the *Turner* standard. Any standard that we would apply, including *Turner*, would require that the challenged policy at least "impinge" on the detainees' constitutional rights. *See Turner*, 482 U.S. at 89. Here, there is no impingement, but only a

demand for a *better way* to communicate with detainees outside their units—a way better than the U.S. mail. There is, after all, a system in place for communication *among* staff and for detainee communication *with* staff, and the plaintiffs see no reason that they should not be allowed to use that system for their own purposes. But that is nothing more than a recommendation for the officials at Rushville to consider—a suggestion about how operations at the facility could be improved; it does not state a constitutional claim. As maligned as the United States Postal Service may be, there is no First Amendment right to a means of sending letters superior to the one it provides.

AFFIRMED.

WOOD, *Circuit Judge*, concurring in part and dissenting in part. Although I join the court's conclusion that the plaintiffs' "internal mail claim" falls short as a matter of law, I regret that I do not share their assessment of the "in-person association claim." At root, this claim is about the plaintiffs' right to treatment for their condition; it is what distinguishes them from prisoners. Even if security concerns trump almost all other constitutional interests of convicted criminals, the same is not true of

those suffering from a mental disorder. As I explain below, I do not believe that the naked incantation of the word "security" is enough to relieve the staff at the Rushville Treatment and Detention Center of its duty to exercise professional judgment when it makes decisions that affect the rehabilitative aims of the facility. I would reverse the district court's grant of summary judgment on this point, and thus, I respectfully dissent.


**I**

The plaintiffs are sexually violent persons (SVPs) who have been civilly committed to the Rushville facility, which is located in west central Illinois. The SVP designation means that the person "suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS § 205/5(f). Recognizing that this behavior stems from a mental disease, the Illinois Department of Human Services, Sexually Violent Persons Treatment and Detention Facility has as its stated mission the goal of providing "specialized treatment that promotes a personal responsibility and pro-social behavioral change" so that "[a]ll residents [may be] released and successfully returned to their communities." *Illinois Department of Human Services, Sexually Violent Persons Treatment and Detention Facility*, RESIDENT HANDBOOK 8 (August 2008). Unfortunately, according to plaintiffs, these laudable aims are far from being realized. Instead, plaintiffs say, Rushville has adopted a policy under which their social interaction is limited to the same 25 other patients for

between 20 and 22 hours a day, for practically the entire duration of their commitment to the facility (which often runs for years, if not decades). This severe restriction on human interaction, they assert, stunts the very treatment that should be the cornerstone of one's residency at Rushville.

In evaluating Rushville's policy, we must not lose sight of the legal justification for the detention of its residents. As the Supreme Court has stated, civil commitment may not "become a 'mechanism for retribution or general deterrence.'" *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 372-73 (1997) (Kennedy, J., concurring)). Indeed, because Illinois's SVP procedures "recommend[] treatment if such is possible" and "permit[] immediate release upon a showing that the individual is no longer dangerous or mentally impaired," it is beyond dispute that the purpose of the plaintiffs' detention is not punitive. *Hendricks*, 521 U.S. at 368-69. Although the plaintiffs are not free to leave Rushville until they are deemed cured, they are not prisoners in the traditional sense; rather, their commitment is meant to be rehabilitative and aimed at the goal of their ultimate release.

It is against this backdrop that I turn to the plaintiffs' claims in this case. They assert that even though undisputed testimony has established that "the ability of residents to engage in social interaction with a broad array of other residents . . . is crucial to creating a positive therapeutic atmosphere," the Rushville facility has decided to isolate the six housing units within Rushville

from each other without regard to these therapeutic effects and without input from the clinical staff. The majority has several responses to these allegations. First, the majority questions the basic premise of the plaintiffs' argument: It questions whether Rushville's policies really have any effect on treatment, noting that "[i]t cannot be . . . that *all* decisions that have an impact on detainees are treatment decisions." *Ante* at 6 (emphasis in original). This trivializes the plaintiffs' point: They are not saying that every decision, no matter how inconsequential (bedtime at 9 pm, commissary hours, or the like) is automatically a treatment decision. They are saying, with the support of expert testimony, that the particular policies they are challenging have a profound impact on treatment, and they are saying that these policies have not been developed with the proper professional input.

The majority also suggests that even if the amount of social interaction has an effect on the plaintiffs' treatment (a point we must assume as true at this stage of the litigation), the "Rushville detainees have opportunities to associate in-person with approximately one-hundred and fifty detainees each week." *Ante* at 4. This statistic, however, masks a much more troubling reality: For all hours of the day except for, at most, four hours, the plaintiffs spend all of their time with the same 25 people (their pod-mates). Then, for two to three hours per day, the plaintiffs get "yard" or "gym" time, which they share with their unit. Practically, during this recreational time the residents' social circle is expanded to include only the other two 25-person

pods in their unit. The patients also have small group therapy for an average of less than one hour a day. But once again, these episodic sessions are limited to same small set of patients each time, and given the philosophy dictating unit assignment, they probably do not represent an increase in social interaction. The far more sporadic encounters with people outside the unit described by the majority (such as a movie every other month, three summer picnics, and a Christmas concert) add little, as the majority acknowledges. *Ante* at 4.

Importantly, as I have already noted, the plaintiffs have presented unrebutted expert evidence suggesting that the amount and nature of the actual (and undisputed) social interaction Rushville offers is inadequate to promote their "release[] and successful[] return[] to their communities. "It is also telling that the efforts by Rushville's own clinical staff to increase the amount of social interaction between patients have been quashed by the facility's administrative staff. This raises a crucial threshold question that the majority's analysis has overlooked: *Who* is entitled to decide whether a policy is (1) purely related to treatment, (2) purely related to security, or (3) related to both?

One consequence of the important distinction between punitive incarceration and civil commitment is that decisions that have more than an incidental impact on the rehabilitative aims of a civil commitment facility must be made with input from clinical professionals (in addition to, rather than to the exclusion of, others such as security experts). This requirement comes

straight from *Youngberg v. Romeo*, 457 U.S. 307 (1982), the case that sets the rules for assessing the validity of the policies set by civil commitment facilities. *Youngberg* noted that the federal Constitution requires "that the courts make certain that professional judgment *in fact* was exercised." 457 U.S. at 321 (emphasis added). Following that lead, we have similarly emphasized the need for professional judgment in balancing "progress toward that goal that justified plaintiffs' commitment" and "institutional security." *Johnson by Johnson v. Brelje*, 701 F.2d 1201, 1209 (7th Cir. 1983); see also *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003).

The majority argues that our decision in *West v. Schwebke*, 333 F.3d 745 (7th Cir. 2003), obviated the need for any such clinical input; it focuses on the statement that "'if at trial defendants can establish that their use of seclusion was justified on security grounds, they will prevail without regard to the question whether extended seclusion is justified as treatment.'" *Ante* at 7 (quoting *Schwebke*, 333 F.3d at 748). But this overlooks the fact that in *Schwebke* we also emphasized the need for "considered judgment," 333 F.3d at 748, and so we actually remanded to the district court to determine whether the policy at issue was, in fact, justifiable on either security or treatment grounds. 333 F.3d at 748-49 (noting conflicting evidence on whether policy was "appropriate from a security perspective"). Because it was an open question whether the policy was justifiable on security or treatment grounds, we had no occasion to reach the issue of who was entitled to make such a determination and whether a policy affecting treatment

can be re-branded—without *any* input from a clinical professional—as one that is only security-related. One powerful reason to reject a reading of *Schwebke* that implies that the word "security," once uttered by the administrative staff of a civil commitment facility to justify a policy, trumps all treatment needs, is that such a ruling would be inconsistent with the Supreme Court's directives in *Crane* and *Youngberg*. This is not to say that security does not have an important role to play in facilities such as Rushville; it is merely to recognize that security and treatment goals both have a part to play. The job of reconciling these two interests does not belong to the courts. To the contrary, it is precisely because courts are ill-equipped to "second-guess the expert administrators on matters on which they are better informed," *Youngberg*, 457 U.S. at 323 (quoting *Parham v. J.R.*, 442 U.S. 584, 607 (1979)), that the Supreme Court held that qualified professionals from both the security and the treatment sides must have a say in matters that simultaneously implicate both treatment and security.

Summary judgment in the defendants' favor can be justified only if the clinical staff at Rushville either (1) acceded to the view that the facility's social interaction policy does not implicate substantial rehabilitative concerns (a professional judgment that we would review under *Youngberg*'s deferential standard) or (2) have had an appropriate amount of input into a decision-making process that balances the rehabilitative concerns against the security and administrative interests of the facility. A policy that emerged from such a process would pass

muster so long it complied with minimum professional standards and was otherwise constitutional. Thus, although it may be true that "[s]ecurity decisions do not violate *Youngberg just because* they restrict treatment options," *ante* at 8, security decisions that restrict treatment options without any input from clinical staff do violate *Youngberg*. The majority appears to concede that the clinical staff neither agreed that the social interaction policy had nothing to do with rehabilitation nor did it have any input into the policy. *Ante* at 6 ("[T]here is no serious argument that the contested restrictions are the product of [the exercise of professional judgment]"); *ante* at 8 (adopting flat rule that security decisions never violate *Youngsberg* only because "they restrict treatment options"). That is why this aspect of the case should be moving forward.

The undisputed facts in the record before us are not sufficient to permit a judgment on the question whether the policies challenged in this case were valid. There is a material question of fact on the question whether Dr. Jumper, Rushville's Clinical Director, made a reasoned professional judgment that he and his staff had no need to participate in the process that set the policy regarding social interaction among units. Dr. Jumper insisted in his deposition that he "is not involved in the decisions regarding which units use yard," that "no one on the clinical staff is involved in that decision" and that he is "not involved in any of the decisions regarding who goes on the yard." He has changed his tune a bit in his brief, where he now says that his "decision not to be involved . . . was in fact evidence of his

exercise of discretion." But it is well-established that people cannot rewrite or revise their depositions in later affidavits or briefs. In addition, the plaintiffs have presented other evidence that the clinical staff tried to change the social interaction policies but their efforts were rebuffed. Contradictorily, Dr. Jumper testified that "clinical reasons" are "irrelevant" because "the operational needs of the facility would supercede." This evidence might be interpreted by a reasonable jury in either of two ways: They might conclude that Dr. Jumper did not consider the clinical impact of the security policy, but they might equally infer that Rushville had put him in his place, and he knew that he and his clinical staff were excluded from the decision-making process by its operational staff.

The extent of the clinical staff's participation in the decision-making process is also highly contested. The plaintiffs have presented significant evidence suggesting that clinical staff had little, if any, input into policy decisions regarding social interaction, and that their suggestions often fell on deaf ears. They have evidence suggesting that no clinical staff member was involved in yard time decisions, that clinicians expressed serious doubts about the administrative personnel's decisions to decrease unit interaction, and that their suggestions to increase social interaction were unapologetically rejected by security staff. In response, Rushville argues that the clinical staff's input into placing new residents into their respective housing units and pods is an adequate substitute for input into setting the overall policies. Again, a trier of fact might

ultimately conclude (depending on how much mean-ingful interaction occurred) that such an initial assess-ment is adequate to compensate for the clinical staff's ongoing inability to effect change in the social interaction policies, but it is not our role to resolve that issue. In light of this evidence, I cannot conclude that summary judgment was appropriate on this claim. A reasonable fact-finder could find that Dr. Jumper and his clinical staff were excluded from a decision-making process to which they should have been party. This claim should proceed to trial.

## II

As I noted at the outset, I join my colleagues' assessment of the plaintiffs' "internal mail" claim. The requirement to use the United States Postal Service for inter-unit mail is not a sufficiently substantial "impingement" of the detainees' constitutional rights. This is not a case like *Lindell v. Frank*, 377 F.3d 655 (7th Cir. 2004), where the challenged policy (there, a publishers-only restriction) clearly violates an expressive right. Nothing in this policy limits the inmates' ability to communicate, or imposes a content- or viewpoint-based restriction on their correspondence.

* * *

For these reasons, I respectfully DISSENT from the court's resolution of the "in-person association" claim, which I would remand for further proceedings.